```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     United States of America,    ) Criminal Action
                                     ) No. 1:17-cr-00083-KBJ
 4                      Plaintiff,   )
                                     ) Motion Hearing
 5     vs.                           ) (via videoconference)
                                     )
 6     Keith J. Young,               ) Washington, D.C.
                                     ) October 20, 2020
 7                      Defendant.   ) Time:  2:30 p.m.
       _____
 8
                    Transcript of Motion Hearing
 9                      (via videoconference)
                             Held Before
10     The Honorable Ketanji Brown Jackson (via videoconference)
                       United States District Judge
11     _____

12                    A P P E A R A N C E S

13     For the Plaintiff:        Joseph Drummey
       (via videoconference)     U.S. ATTORNEY'S OFFICE
14                               FOR THE DISTRICT OF COLUMBIA
                                 555 Fourth Street, Northwest
15                               Washington, D.C. 20530
                                 joseph.drummey@usdoj.gov
16
       For the Defendant:        Joanna Munson Perales
17     (via videoconference)     FEDERAL PUBLIC DEFENDER
                                 FOR THE DISTRICT OF COLUMBIA
18                               625 Indiana Avenue, Northwest
                                 Suite 550
19                               Washington, D.C. 20004
                                 joanna_perales@fd.org
20     _____

21     Stenographic Official Court Reporter:
       (via videoconference)     Nancy J. Meyer
22                               Registered Diplomate Reporter
                                 Certified Realtime Reporter
23                               United States Courthouse, Room 6509
                                 333 Constitution Avenue, Northwest
24                               Washington, D.C. 20001
                                 202-354-3118
25
```

1        P R O C E E D I N G S

2             (COURT REPORTER'S NOTE:  This hearing was held during
the COVID-19 pandemic restrictions and is subject to the
3       limitations of technology associated with the use of
technology, including but not limited to telephone and video
4       signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5       reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7             THE COURTROOM DEPUTY:  This is Criminal Case 17-083,

8       United States of America v. Keith J. Young.

9             Starting with the government, I'm going to ask counsel,

10      please state your appearance for the record.

11            MR. DRUMMEY:  Good afternoon, Your Honor.  Joseph

12      Drummey for the United States.

13            THE COURT:  Good afternoon.

14            Defense counsel, please.

15            MS. PERALES:  Good afternoon.  Joanna Munson Perales

16      for Mr. Young.

17            THE COURT:  Good afternoon, Ms. Perales.  And I see

18      that Mr. Young is on video.

19            This is a hearing on a motion for compassionate release

20      that defendant, Keith Young, filed on September 22nd,

21      requesting that his sentence be reduced under section 3582 of

22      Title 18 of the United States Code.

23            That motion is now fully briefed, and counsel have --

24      counsel for both sides have been -- before getting into the

25      details, let me just ask Mr. Young, is your audio muted?  Mute

1    your device.

2                    THE DEFENDANT:  It's unmuted now.

3                    THE COURT:  No.  I'd like for it to be muted.  We

4    were hearing some -- all right.  Thank you.

5           Before getting into the details of Mr. Young's motion,

6    let me acknowledge that we are proceeding via videoconference

7    technology because we're only in Phase 2 of our plan for

8    reopening the courthouse, which was closed for in-person

9    hearings from March until September in light of the COVID-19

10   pandemic.  Chief Judge Howell has issued a standing order that

11   authorizes the Court to use video and audio technology with the

12   defendant's consent after making certain findings when

13   necessary for certain criminal proceedings.

14          This particular kind of proceeding is not one that is

15   specifically required under the standing order, but let me ask

16   Ms. Perales if Mr. Young consents today by videoconference?

17                    MS. PERALES:  Yes, Your Honor, he does consent.

18                    THE COURT:  All right.  I will just say for the

19   record then that I do find that it is in the interest of

20   justice to proceed with today's hearing via remote technology

21   for multiple reasons, including that Mr. Young is currently

22   incarcerated in North Carolina and that any further delay could

23   result in serious harm to the interests of Mr. Young and the

24   public.

25          All right.  So let's turn to the hearing on Mr. Young's

1    motion to reduce his sentence.  Mr. Young has served, at this

2    point, approximately 41 months of a 240-month sentence the

3    Court imposed after a jury convicted him of unlawful possession

4    with intent to distribute 1 kilogram or more of heroin in

5    violation of Title 21 § 841(a)(1) and 841(b)(1)(A) and unlawful

6    possession of a firearm and ammunition by a person convicted of

7    a crime punishable by imprisonment for a term exceeding one

8    year in violation of Title 18 § 922(g)(1).  I have had this

9    case from the beginning, so I'm fully aware of the facts and

10   circumstances pertaining to Mr. Young's offense, conviction,

11   and sentence.

12        I'm also familiar with the arguments that you made in

13   your papers with respect to Mr. Young's motion.  Let me have

14   you focus on those arguments now.  We'll discuss them in the

15   context of this hearing, and I'll be asking questions, but I am

16   mindful that this is a virtual hearing, that the -- makes

17   robust dialogue difficult.  So I might not ask as many

18   questions as if we were together in person.

19        I'm going to start with Ms. Perales who can explain for

20   the record why she thinks compassionate release is warranted

21   here and what sentence she is requesting.  The government can

22   then respond, after which I will entertain any replies, and if

23   I have what I need from today's hearing to rule on the motion,

24   I will do so at the conclusion of the hearing.

25        In the meantime, since we are proceeding by video, we'll

```
1    try not to talk over each other for the benefit of our court
2    reporter.  So with that, Ms. Perales -- I am -- I am concerned
3    because I do hear -- does anybody else hear that tone?  I'm not
4    quite sure what it is.
5                    (Off the record.)
6                    THE COURT:  Ms. Perales.
7                    MS. PERALES:  Yes, Your Honor.  Thank you very much.
8    So as I know that the Court has read the parties' submissions,
9    I wanted to provide an update about Mr. Young's hearing, and I
10   did want to make sure that Mr. Young is hearing everything we
11   are saying.  When I have spoken with him on the phone, he has
12   not.  So could we take a moment to ask whether he is getting
13   everything we are hearing -- I mean we are saying?  Apologies.
14                   THE COURT:  Yes.  Mr. Young?
15                   THE DEFENDANT:  I can -- I can hear real loud.  I can
16   hear.
17                   THE COURT:  All right.
18                   THE DEFENDANT:  Yes, ma'am.
19                   THE COURT:  So you can hear.  Great.
20                   THE DEFENDANT:  Yes, ma'am.  Real loud.  I can hear,
21   yes, ma'am.
22                   THE COURT:  And we will try to keep our voices up to
23   make sure.  If at any time you cannot hear, please, you know,
24   shake your head so we'll know and we'll repeat or try to see
25   how we can address it; okay?
```

1           THE DEFENDANT:  Yes, ma'am.

2           THE COURT:  All right.  You go back to mute.  Thank

3    you.

4        Ms. Perales.

5           MS. PERALES:  Yes.  Thank you.

6        So I first wanted to update the Court about his hearing.

7    He was given a hearing test on September 24th, which was the

8    same one that he had been given in February.  He, again, heard

9    nothing.  This is the kind of tests that you and I have had in

10   our lives where it's the beep, beep, and he heard nothing.  He

11   has been kept, instead, in protective custody with nothing

12   further.  And so what's happened at this point to add to the

13   extraordinary and compelling circumstances that I will address

14   in one second, is that he has been complaining for [sic]

15   hearing loss for over a year -- for almost a year, which is --

16   you can see that on page 13 of the medical records.

17       But there's now an additional concern that has come to

18   light since my filing.  As this Court may be aware, many D.C.

19   residents are housed at Rivers.  And Mr. Young was very quickly

20   moved from his unit to protective custody with no explanation,

21   and so word has gone from D.C. residents at Rivers back to D.C.

22   to his brother saying that inmates there now believe that he is

23   a snitch and that is why he is in protective custody.  So

24   Mr. Young is now very fearful that should he be returned to the

25   inmate population, the general population, that there may be

1    retaliation for that.

2        What is more, his protective custody now has limited his

3    access to his family.  He's allowed to have five calls,

4    apparently.  He was told this after he had used his five calls

5    for the month, and that was early in the month.  And he has not

6    spoken with his family since, and he will not be able to speak

7    with anyone in his family until early next -- sorry -- until

8    November.

9        I also wanted to update the Court about the testing and

10   follow-up care that was supposed to have occurred.  Many of it

11   was in his records as occurring in September 2020.  It has not

12   occurred in September 2020.  He has not had the echocardiogram

13   for his possible heart condition.  He's not on a statin for his

14   hyperlipidemia, and there's been no discussions about his

15   worrying blood results that may suggest kidney problems.

16       Now, getting to the -- for clarity sake, there is no

17   issue here of exhaustion.  There -- he filed his request to

18   Rivers.  It was denied, and -- and more than 30 days have now

19   passed.

20       Now, last night the government filed a supplement noting

21   that prior smoking is now listed in the CDC guidance as -- as

22   increasing the risk from [sic] COVID.  What this supplement

23   makes clear, makes plain is that the extraordinary and

24   compelling inquiry must be more nuanced and fuller than a

25   simple check the box of whether a person's condition fits with

1     what the CDC says increases your risk as opposed to may

2     increase your risk or that it's not the CDC but another medical

3     expert who has recognized the risk.

4            Nothing in 3582(c)(1)(A) discusses the CDC.  Nothing in

5     the guidelines at 1B1.13 discusses the CDC.  This is what

6     researchers have been explaining for months, that prior smoking

7     was a risk factor.  It then took the CDC until October to catch

8     up, all of which is to say that it's the totality of

9     Mr. Young's conditions that raise his risk.  It's the totality

10    of his obesity, plus his diabetes, plus his asthma, plus his

11    hypertension, plus his obstructive sleep apnea, plus his

12    history of smoking, his hearing loss, plus the issues that have

13    gone untreated; and in their totality, the risk is just too

14    great.

15           Now, this leads me to the numbers of COVID-19 cases at

16    Rivers.  The plain answer for that is we just don't know.

17    BOP's website is still listing that 25 recovered cases that

18    it's been listing for months now.  There was that little blip

19    when counsel filed the emergency motion where there was one

20    positive case, but it's gone away.  I have no idea where.  It's

21    not in the recovered column.

22           Now, as the professor at the University of

23    North Carolina School of Medicine said, which is in Mr. Young's

24    motion, it is very hard to credit the information that is

25    coming out from the BOP or Rivers about what the numbers are

1    like.  We just simply don't know how many are being -- inmates

2    are being tested.  We do not know how many staff are being

3    tested.  We do not know how many staff have been ill.  What we

4    do know is that as experts feared, the fall wave is coming to

5    North Carolina.

6         So, at this time, North Carolina has today -- the

7    *New York Times* has a COVID-19 tracker.  And just today, the

8    numbers of new positive cases in North Carolina is about where

9    it was at its peak in July, which is exactly what experts

10   thought might happen, and is, in the last 14 days,

11   25 percent -- I'm sorry, the last 14 days have experienced --

12   North Carolina has experienced a 25 percent increase in its

13   positive case numbers.

14        All of this is worrisome, and it -- what it means for

15   Mr. Young is that he cannot just sit and wait until the virus

16   catches him at Rivers.

17        I want to go on to address -- unless the Court wants me

18   to stop now.

19            THE COURT:  Let me just ask you a couple of things.

20   First of all --

21            MS. PERALES:  Sure.

22            THE COURT:  -- it looks as though from their briefing

23   that the government concedes that Mr. Young has conditions that

24   would raise his risk of serious illness as a result of COVID

25   and, therefore, would count as extraordinary and compelling

1      reasons.

2          So let me just ask you, isn't that enough to move onto

3      the second prong?  I mean, do I need to get into whether the

4      CDC has listed everything and the extent to which he has

5      multiple conditions?  It seems like there's no dispute that he

6      qualifies under the first part of the test.

7          MS. PERALES:  I -- I understand the -- the question.

8      I -- I think, though, that what is happening here is a

9      disagreement about how to weigh the risk to the defendant and

10     the -- the 3553(a) factors.  And so what the government has

11     been wanting to do is to say there's nothing to see here about

12     risk.  We agree about one issue.  Let's move on.

13         But the point is not just you might have one condition

14     and then that raises your risk.  Your risk is incrementally

15     raised the more conditions you have, which is what the CDC says

16     itself.  And so the -- the urgency then to act now is

17     heightened, and we don't -- we can't just sweep the other

18     conditions under the rug simply because there's some

19     disagreement about whether it's the CDC or whether it's a may

20     or it is definitely an increase, because all of it together

21     heightens the urgency that we need to act with.

22         THE COURT:  All right.  Well, let me ask you this:

23     Why can't the risk that you're talking about be mitigated in

24     other ways?  So you suggest from your briefing that, for

25     example, Mr. Young is not getting all of the medications that

1   he needs or that he hasn't gotten the testing that he needs or

2   that there's a problem potentially with the number of cases of

3   COVID at this particular facility.

4        While the Court cannot order that he be moved, the Court

5   can recommend it, and so if we were to get Mr. Young to a

6   different facility, wouldn't -- wouldn't that solve the risk

7   problem and we can go on and talk about how and to what extent

8   his sentence needs to be reduced?

9        MS. PERALES:  Now, Mr. Young himself has been asking

10  to be moved to another facility.  He has been told he will not

11  be.  I don't have the paperwork specifically, but he has been

12  told that in -- by his counselor.  And so while I recognize

13  that the -- as -- as you said, the Court cannot bind the BOP to

14  move him, although it may be persuasive, the problem will be

15  the same.

16       And so the problems of his conditions are not -- in the

17  midst of COVID-19 are not going away.  What is also problematic

18  for him is the movement in itself.  Moving someone from one

19  institution to another increases the risk in and of itself.

20  You are put on a bus.  You are put on a plane.  And those

21  movements, just like the rest of us are as much as possible

22  trying to stay in one place, it would risk him getting the

23  virus as he -- as he is moved to a new facility.

24       THE COURT:  All right.  So why -- assuming he has an

25  extraordinary and compelling reason for a sentence reduction --

1    well, let me ask you one other question before we move from

2    that.

3        What -- what does the First Step Act change have to do

4    with that?  Is it an independent reason that you are offering

5    for -- to satisfy the extraordinary and compelling reasons

6    criteria?

7        MS. PERALES:  It was both an independent reason as

8    something under USSG 1B1.13(1)(D), but it was not alone.  It is

9    the health conditions that he has, coupled with the fact that

10   his 20-year sentence is no longer required by law.  So that --

11   so the First Step Act change is an extraordinary and compelling

12   circumstance.

13       However, I am cognizant that this Court may not be

14   inclined to use the application note in that manner, and I do

15   think that the change in law is highly relevant to what a just

16   sentence would be today and whether he has served a sufficient

17   amount, especially when requesting home -- home detention or --

18   or any other type of home incarceration this Court would want

19   to order, that that would be a relevant factor.  And so prior

20   to the pandemic, not knowing that Mr. Young had these health

21   conditions that were going to increase his risk, this Court

22   believed that a 12.5-year sentence was just.  Now Mr. Young has

23   served 30 percent of that sentence that the Court believed is

24   just -- was just and is asking for a significant period of home

25   detention.

1    This Court did not sentence Mr. Young with the

2    expectation that he would become seriously ill or die from a

3    pandemic like no other seen in our lifetime.  And so it's the

4    lower sentence that would apply after the First Step Act,

5    coupled with his health conditions of COVID-19 that would

6    support his release.

7         Now, moving -- I'm sorry.

8              THE COURT:  Yeah.  Go ahead.

9              MS. PERALES:  Okay.  Moving onto the other 3553(a)

10   factors.  One large part of that is the sentence that would

11   have otherwise applied.  The other factors that this Court is

12   very well likely asking itself, what has changed in the 40

13   months that he has been imprisoned?  We recognize that this is

14   not a large portion of his sentence.

15        But he has experienced imprisonment.  Forty years is

16   not -- I'm sorry.  Forty months is not nothing.  And in that

17   time, he has been away from his family in an institution, with

18   many health problems.  As this Court recognized, he did not

19   have a huge criminal history, and so this means that this

20   experience is much different than what he has experienced in

21   the past.

22        Now, his health conditions we've already discussed how

23   they have worsened and how he has lost his hearing.  That has

24   substantially made the time that he's been in prison more

25   onerous than it would be otherwise.

1    Then, also his children are older.  They're more

2   self-sufficient.  His wife has shown that she can support the

3   family without his illegal activities, and she has made it

4   clear in no uncertain terms that he will not be allowed to do

5   to the family what he did before and risk their lives and

6   their -- and their ability to live in D.C.  They all moved away

7   from D.C., which is where he will go to live again.  And so

8   when he went to prison, it's not -- he has been there only

9   40 months, but he has tried very hard in those 40 months to

10   show the Court that he has been able to change.

11    One important thing is he's been committed to work that

12   is menial.  He has done a recycling program, but he has done

13   that consistently until it was stopped for COVID-19.  He's had

14   no disciplinary incidences.  He's taking class -- many classes

15   and he's taught many classes.  The letters from his family make

16   clear he has opened up, he has changed, and he is not the same

17   man he was when he was first caught for this case.

18    THE COURT:  Well, what do I do about dangerousness,

19   Ms. Perales, and the concern that Mr. Young -- the evidence at

20   trial, which the Court was introduced to, along with the jury,

21   indicated that Mr. Young was dealing drugs out of his home,

22   kept serious weapons and ammunition inside the house.  Those

23   seem to be indicia of a danger that wouldn't be mitigated in

24   the circumstance of returning him to his home in a home

25   incarceration kind of scenario.  So what -- what do you say

1    about that?

2            MS. PERALES:  At the time of the crime, he was not

3    under the intense supervision that he would be under home

4    detention.  And so the significant period of home detention is

5    what would allow the Court to consider that he is less

6    dangerous than he was when the crime occurred.

7          As noted in my motion, the Sentencing Commission itself

8    recognizes a day-for-day home detention/incarceration

9    equivalency.  And in that way, home detention is punitive, is

10   something that will change -- that is not freedom.

11           THE COURT:  But, of course, it's only -- the

12   guidelines recognize that, but only in certain circumstances,

13   and even in the first instance, Mr. Young would not have been

14   eligible for that kind of sentence.

15           MS. PERALES:  Yeah, that's very true, Your Honor.  I

16   understand that.  The point is not that he would have then.

17   It's that we recognize now that there -- that he may die or be

18   seriously harmed from COVID-19 in prison, and, therefore, we're

19   going to mitigate the risk by allowing him to do a significant

20   portion of his sentence on home detention.

21           THE COURT:  All right.  Did you have something else?

22           MS. PERALES:  No, Your Honor.  I'm done.

23           THE COURT:  All right.  Let me turn to government

24   counsel.  Mr. Drummey.

25           MR. DRUMMEY:  Thank you, Your Honor.  I'll be brief,

1    and largely the government rests on its briefing, and I'm happy

2    to answer any questions the Court might have.

3         I agree with Ms. Perales; that the exhaustion

4    requirement has been -- is not at issue in this case.  As the

5    Court implied -- or noted, the government has conceded that

6    defendant's type 2 diabetes and his obesity constitute

7    extraordinary -- compelling and extraordinary reasons for his

8    release under the statute.

9         So from the government's perspective, the -- the heart

10   of the dispute in this case on this motion rests on a

11   reevaluation of the 3553(a) factors and whether or not

12   defendant remains a danger to the community.  And for reasons

13   noted in the government's opposition, the government believes

14   that the sentence in this case was significant, but it

15   corresponds to what in the government's view is very

16   significant conduct.

17        In this case, defendant stored drugs for distribution at

18   a home he shared with his wife and teenaged sons.  He -- these

19   bricks of heroin were mixed with fentanyl.  And as the Court is

20   well aware, that mixture is very dangerous to users of that

21   drug because they often aren't aware of the presence of it, and

22   small doses can be fatal.

23        Also, with respect to severity, defendant in this case

24   had purchased and possessed very large quantities of this drug.

25   It appears from the evidence that I've reviewed in coming into

1    this case in this context that he purchased for $180,000, two

2    bricks of heroin.  So although his criminal history is

3    certainly dated -- and the one significant conviction he has is

4    from 1994 -- the government doesn't believe that someone could

5    stumble into this sort of criminal conduct in a short-term

6    basis, but, instead, the facts at trial and the facts that the

7    Court was aware of at sentencing suggest someone who developed

8    over time the resources and the connections necessary to engage

9    in this pattern of criminal conduct like the one that was

10   evidenced by what was discovered at the search warrant.

11        Also significant from the government's perspective,

12   Your Honor, is that the arrest initially did not deter him

13   from -- in jail -- has recordings -- seeking to recover drug

14   monies still owed to him on the streets.  And -- and also

15   significant is that his motivation in this case appeared to be

16   a lucrative business opportunity, not some sort of cycle of

17   drug addiction that would get someone involved in the drug

18   trade, as the Court sees in other cases.

19        So in light of all of that and the presence of the

20   firearm and the ammunition found by that search warrant, the

21   government believes this is a very significant crime and that

22   three years of incarceration is insufficient and that the

23   record does not support a conclusion that he would not pose a

24   danger to the community if released.

25             THE COURT:  Let me ask you -- and this might be

1    something that Ms. Perales addresses in reply as well.

2         Your filing, by and large, suggests that the only two

3    options available for the Court under section 3582 are to grant

4    the motion for a sentence reduction and release Mr. Young

5    entirely, whether to home confinement or, you know, total

6    release, or to deny the motion and leave his sentence

7    untouched.  And that is actually not how I read the statute.

8         And so what I'd like to know from the government, two

9    things.  One is:  Is that your position; that the Court has no

10   authority under the statute to reduce his sentence, but not to

11   zero; and then, secondly, what is the government's view of this

12   intervening change in the law that would mean that if he were

13   sentenced afresh today he would not be facing a 20-year

14   mandatory minimum?

15         MR. DRUMMEY:  With respect to your first question,

16   Your Honor, in the opening brief, defendant cites a District of

17   Maryland decision for the proposition that the Court could

18   reduce the sentence as opposed to just immediately releasing

19   him.  The government's position is that such -- proceeding in

20   that manner would be inconsistent with the policy statement

21   that asks the Court to, as an initial matter, before granting a

22   reduction, find that he no longer poses a danger to the

23   community.

24         So the government believes that finding that he no

25   longer poses a danger to the community, but, nonetheless,

1    reducing his sentence and keeping him incarcerated would be an

2    inconsistent application of the compassionate release statute.

3         THE COURT:  Based on submissions -- not in the

4    statute, because the statute certainly says that the Court can

5    reduce a person's sentence.  It doesn't say the Court must

6    release the person or anything like that.  It says it can

7    reduce.  So your argument is something about the guideline,

8    which the Second Circuit, by the way, has found is actually

9    inapplicable because the guidelines have not been updated to

10   reflect the current state of affairs, which is a Court -- a

11   defendant's motion under 3582 rather than the Bureau of

12   Prisons'.

13        But assuming the commission's guideline is applicable,

14   the government's position is that if you -- that the Court

15   either needs to make a finding related -- regarding his lack of

16   dangerousness, and if I do so, then I would have to completely

17   release him, but if I can't, then I'd have to not reduce the

18   sentence; is that your position?

19        MR. DRUMMEY:  That is the government's position,

20   Your Honor.  And that is correct that the statute itself, the

21   text, does not reference this dangerousness inquiry, but,

22   instead, the government is relying on the policy statement for

23   that argument.

24        THE COURT:  All right.  Ms. Perales --

25        Let me have you address the second issue, which is the

1    First Step Act point.  I mean, it would seem to me that at this

2    point, to the extent that the government concedes that

3    Mr. Young has extraordinary and compelling reasons, and

4    notwithstanding Ms. Perales's request that those reasons are so

5    sufficient that he should be completely released to home

6    confinement, at a minimum the Court is reevaluating his

7    sentence in light of the 3553(a) factors pursuant to the

8    statute.

9         So what is the government's view as to how I'm to

10    evaluate the First Step Act change in light of the 3553(a)

11    reanalysis?

12         MR. DRUMMEY:  So, Your Honor, the government

13    acknowledges that the Court was critical of the government's

14    sentencing enhancement in this case, but the government

15    respectfully contends that the mandatory minimum, which was

16    permissible at the time of sentencing was appropriate in light

17    of the severity of the circumstances present here for the

18    reasons I previously described.

19         Now, the defendant has served approximately three years

20    in prison, and with respect to the 3553(a) factors and how the

21    ten-year mandatory minimum that's currently in effect might

22    apply, the Court in reevaluating its sentence would need to

23    find -- identify a sentence that is sufficient but not greater

24    than necessary to serve the purposes of punishment in this

25    case.  And I know the Court indicated at the sentencing hearing

1    that 12.5 to, I believe it was, 15.5 years -- although I could

2    be wrong about that, was -- was the range that might fit that

3    bill.

4           But whether or not we're talking about a 20-year

5    sentence or a 12.5-year sentence, the government's position is

6    that the punitive time defendant has served thus far is

7    insufficient in light of the 3553(a) factors, especially

8    regarding the severity of his crime, and that granting a

9    sentence reduction and, in the view of the government, granting

10   compassionate release, which is what the government's [sic]

11   position is in this case, as far as the Court's authority would

12   go, would not amount to a sentence that is sufficient to serve

13   the purposes of -- of criminal punishment.

14          Now, the government's also aware that the Court, based

15   on previous indications at the sentencing hearing, does not

16   believe that the 20-year mandatory minimum is not greater than

17   necessary to serve the ends of -- of criminal punishment, but

18   the government's position is that that sentence was permissible

19   by statute at that time.  And in order to reduce it from it,

20   the Court would need to find that the three-year sentence he

21   has served thus far is both sufficient and not greater than

22   necessary.  And because the record in the government's opinion

23   cannot support a conclusion that it is sufficient, the

24   government's position is that the defendant's motion for

25   compassionate release should be denied.

1           THE COURT:  I'm not quite sure that I understood your

2   argument.  So let me ask it this way:  Do you agree that at the

3   end of the day if the Court were inclined to reduce Mr. Young's

4   sentence to something less than the 20-year mandatory minimum,

5   but not zero, that the Court would have to look at the 3553(a)

6   factors as it did in the first instance and select a sentence

7   that was sufficient but not greater than necessary to comply

8   with the purposes of punishment?

9           MR. DRUMMEY:  Yes, Your Honor.

10          THE COURT:  All right.  So if I'm doing that, one of

11  the 3553(a) factors is the need to avoid unwarranted sentencing

12  disparities.  What is the government's position regarding

13  whether given the fact that today a person who has done what

14  Mr. Young was convicted of doing and with his criminal history

15  identically situated would not be facing a 20-year mandatory

16  minimum, how am I to take that into account, and is it

17  appropriate for me to do so at this point?

18          MR. DRUMMEY:  Your Honor, certainly that's something

19  the Court can consider, but the government's position here is

20  that the sentence as it was imposed in 2018 was appropriate.  I

21  understand the Court is critical of it, but the government

22  believes that it is appropriate in light of the conduct in this

23  case, and I understand that the criminal history is something

24  that the Court has looked at.  He has one significant

25  conviction from 1994, but the government's position is that

1    that criminal history is not representative sort of conduct --

2               (COURT REPORTER'S NOTE:  Court reporter's loss of

3    power.)

4               THE COURT:  Mr. Drummey, can we just have you say a

5    couple more sentences to recap what it was that you were saying

6    before?

7               MR. DRUMMEY:  Yes, of course, Your Honor.  It's that

8    that single conviction is not representative of the type of

9    criminal conduct that the government believes this defendant

10   was involved in.  Because the significance and the weight of

11   the drugs involved in this case suggest that this defendant

12   cultivated the resources and network to be in a position in

13   April of 2017, I believe is the month, when the law enforcement

14   officers discovered all of the drugs and ammunition and the

15   firearm inside of his house.

16              THE COURT:  All right.  So I was just about to turn

17   back to Ms. Perales.

18              MS. PERALES:  Yes, Your Honor.  The government's

19   position that 20 years is still appropriate is surprising,

20   because but for this 20-year mandatory minimum that would no

21   longer apply today, the 12.5 to 15.5 years takes account of

22   everything the government is saying they should take account

23   of, which is it takes account of the drugs, it takes account of

24   the ammunition, the guns.

25              And so once you're in the 3553(a) factors, this Court

1    needs to then consider that the -- an identical defendant would

2    today receive 12.5 to 15.5, and that becomes one relevant

3    factor, highly relevant factor, to whether once we know he has

4    extraordinary and compelling circumstances, the time defendant

5    has served is sufficient but not greater than necessary.

6         Let me just take one look at the question you had asked.

7    So as to the *Braxton* case from Maryland, that is -- as the

8    Court said, the statute itself does not -- it says that you

9    could do a sentence reduction.  And so that is something that

10   the Court can do.  Of course, we're worried about Mr. Young's

11   health.  We're worried about his ability to survive if he were

12   to get COVID-19.  But the law allows the Court to do a middle

13   ground, should it wish.

14        Are there other questions that the Court has for me?

15             THE COURT:  Sorry.  So unless -- so you -- it's the

16   defendant's position that the Court could reduce the sentence

17   or not?

18             MS. PERALES:  It is our position that the Court could

19   reduce the sentence.

20             THE COURT:  To take into account the changes in the

21   law?

22             MS. PERALES:  Correct.

23             THE COURT:  What -- what is your view of the

24   government's position that with someone who had as much drugs

25   and various ammunition and other things in his house at the

1     time it was discovered, that Mr. Young actually was a more

2     serious offender than his criminal history indicated?

3              MS. PERALES:  His criminal history is only one way

4     that the guidelines capture the seriousness of the offense.

5     The offense level is another.  And what the government is

6     pointing to is captured in the offense level.  That is how you

7     got to the 12.5- to 15.5-year range.  And an individual with an

8     identical amount of drugs and weapons would receive -- I'm

9     sorry -- would have a guidelines range that is identical.

10             THE COURT:  All right.  Is there anything that either

11    party would like to say?

12         The Court believes that I am in a position to rule on

13    this motion today, but I'll give you the last opportunity to

14    weigh in before I do so.

15             MR. DRUMMEY:  Nothing further from the government,

16    Your Honor.

17             MS. PERALES:  Nothing further from defense counsel,

18    Your Honor.

19             THE COURT:  All right.  The Court has considered the

20    arguments the parties have made, both in the briefs and the

21    filings that have been made and at this hearing today, and I am

22    prepared to rule.

23         Let me check that our court reporter is still on the

24    line.

25             THE COURT REPORTER:  Yes, I am, Your Honor.

1            THE COURT:  All right.  To start, I will briefly

2     recount the basic background facts and the procedural history

3     of this criminal matter and then address the standards that

4     govern motions for sentence reduction under

5     18 U.S.C. § 3582(c).

6            Mr. Young is a 48-year-old man who is currently

7     incarcerated at CI Rivers, which is a privately run

8     correctional facility in Winton, North Carolina.  In April of

9     2018, a jury convicted Mr. Young of two crimes:  unlawful

10    possession with intent to distribute 1 kilogram or more of

11    heroin and unlawful possession of a firearm and ammunition by a

12    person convicted of a crime punishable by imprisonment for a

13    term exceeding one year.  The first of those two convictions

14    carried a statutory minimum penalty of 10 years of

15    imprisonment, but that mandatory minimum penalty was doubled to

16    20 years of imprisonment when the government filed a notice

17    under 21 U.S.C. § 851 based on the only prior felony drug

18    conviction Mr. Young had which had occurred more than

19    two decades before, in 1994.

20            The government's 851 notice also increased the mandatory

21    minimum term of supervised release for Mr. Young's drug

22    trafficking conviction from five years to ten years.  This

23    Court was bound by the government's 851 enhancement at

24    sentencing and it, therefore, sentenced Mr. Young to 240 months

25    of imprisonment followed by a 120-month period of supervised

1    release.

2         In December of 2018, just a few months after this Court

3    imposed Mr. Young's sentence, Congress passed the First Step

4    Act, which, among others, modified the type of prior

5    convictions that can give rise to an 851 enhancement.  Under

6    the act, Mr. Young's prior felony conviction from 1994 does not

7    count as a serious drug felony anymore.  So if Mr. Young was

8    being sentenced today, the government could not file an 851

9    notice on that basis.

10        Following this intervening change in the law, Mr. Young

11   appealed his sentence to the D.C. Circuit arguing that his

12   sentence should be vacated, but the D.C. Circuit upheld his

13   sentence on the grounds that Congress did not make this

14   provision of the First Step Act retroactively applicable to

15   sentences imposed before the act's passage.

16        Mr. Young has now served approximately 41 months of his

17   240-month sentence, and he has now asked this Court to reduce

18   his sentence under the compassionate release statute, which is

19   18 U.S.C. § 3582.  In his motion, Mr. Young asserts that he has

20   multiple medical conditions that increase his risk of severe

21   illness or death from COVID-19, including type 2 diabetes,

22   morbid obesity, asthma, hypertension, obstructive sleep apnea,

23   depression and anxiety, and a history of smoking.

24        Mr. Young also contends that since the beginning of the

25   pandemic he has been unable to receive adequate medical care

1   for a host of other problems, such as hyperlipidemia,

2   progressive hearing loss, possible impaired kidney function,

3   and possible heart condition.  Mr. Young argues that these

4   medical conditions, when combined with the prevalence of

5   COVID-19 at Rivers, constitute extraordinary and compelling

6   circumstances warranting his immediate release.  In addition,

7   he points to the 20-year prison sentence as an additional basis

8   for granting his compassionate release motion, arguing that his

9   outdated and unjust mandatory minimum sentence independently

10  qualifies as an extraordinary and compelling reason that

11  justifies his release or at the very least a reduced sentence.

12        In brief, the government acknowledges that under the

13  First Step Act, Mr. Young would face only a ten-year mandatory

14  minimum penalty if he was sentenced today, but the government

15  maintains that the Court need not address the issue in the

16  brief, and today the government indicates that, notwithstanding

17  that issue, it still believes that Mr. Young's sentence of 20

18  years is the appropriate sentence.  But there's no doubt that

19  the government is concerned that Mr. Young does have medical

20  conditions that qualify as extraordinary and compelling reasons

21  for a sentence reduction under 3582.

22        The government maintains that releasing Mr. Young at

23  this time would undermine the purposes of punishment set forth

24  in section 3553(a).  Specifically, the government argues that

25  41 months of imprisonment, which is the amount of time that

1    Mr. Young has served to date, is insufficient to reflect the

2    seriousness of the offense and that Mr. Young has failed to

3    demonstrate that he no longer poses a danger to the community.

4         Let me lay out the legal standards that are applicable

5    to the defendant's motion and that govern the parties' dispute.

6    Under 3582 -- section 3582, the Court may reduce the

7    defendant's sentence if the following factors have been met:

8    if the defendant has exhausted the remedy; if extraordinary and

9    compelling reasons justify reducing the term of imprisonment

10   that the Court previously imposed; and if a sentence reduction

11   would not interfere with the purposes of punishment that the

12   Court evaluated initially, as set forth in 3553(a), which

13   include the nature and circumstances of the offense, the

14   history and characteristics of the defendant, the need to

15   protect the public from future crimes by the defendant, and the

16   need to avoid unwarranted sentencing disparities.

17        Let me just say that it is the Court's view, as has been

18   laid out in other opinions that I have written in similar

19   cases, that the 3553(a) analysis takes into account the

20   dangerousness concern -- the dangerousness concern that the

21   Sentencing Commission puts forward in its policy statements.

22   So to the extent that there is a concern about dangerousness,

23   it is actually the Court's view folded into the Court's

24   reevaluation of the 3553(a) factors to the extent that those

25   factors require the Court to evaluate the need to protect the

1   public of future crimes of the defendant.

2          It's undisputed in this case that Mr. Young has

3   exhausted his administrative remedies.  So the only issues that

4   need to be specifically addressed to resolve Mr. Young's motion

5   are whether extraordinary and compelling reasons justify

6   reducing the term of imprisonment and whether any such

7   reduction would be consistent with 3553(a) sentencing factors.

8          So the Court has done that analysis.  I've evaluated

9   Mr. Young's motion, and I conclude that although his medical

10  conditions constitute extraordinary and compelling reasons that

11  warrant a defendant's reduction in the age of COVID, totally

12  releasing Mr. Young entirely at this time, even to home

13  incarceration, after a mere 41 months of incarceration, would

14  not be consistent with the purposes of punishment set forth in

15  3553(a).  That said, the Court agrees with Mr. Young that 240

16  months of imprisonment is now greater than necessary to achieve

17  the purposes of punishment given the intervening change in the

18  law.  And, for that reason, the Court has determined that some

19  reduction in Mr. Young's sentence is warranted.

20         Let me just explain briefly how I reached those

21  conclusions.  As an initial matter, the Court finds that

22  Mr. Young's serious medical conditions, specifically his

23  diabetes and obesity, do constitute extraordinary and

24  compelling circumstances that warrant a sentence reduction.

25  Again, the government has conceded as much.  Under section

1    1B1.13 of the *Guidelines Manual*, extraordinary and compelling

2    reasons exist where a defendant suffers from a serious physical

3    or medical condition that substantially diminishes his ability

4    to provide self-care within the environment of a correctional

5    facility.

6        The CDC has specifically included type 2 diabetes and

7    obesity among the list of medical conditions known to increase

8    an individual's risk of severe illness from COVID-19, and this

9    Court has previously recognized that such illnesses qualify as

10   serious physical or medical conditions that would substantially

11   diminish a defendant's ability to provide self-care.  As a

12   result, the Court is convinced that Mr. Young's diabetes and

13   obesity qualify as extraordinary and compelling reasons that

14   justify a sentence reduction given the COVID-19 pandemic.

15       Now, having made that assessment, I do understand

16   Ms. Perales's intentions of discussing his other conditions,

17   explaining that they all work together to create a sentence of

18   urgency, but the Court reads the statute to be such that as

19   long as there is extraordinary and compelling reason, whether

20   it's one medical condition or many medical conditions, that's

21   enough.  So the Court doesn't need to determine the extent to

22   which his other health conditions are sufficiently serious to

23   qualify as extraordinary and compelling circumstances, nor does

24   the Court need to determine whether Mr. Young's 20-year

25   mandatory minimum sentence qualifies as an additional

1    extraordinary and compelling reason to reduce his sentence.

2         But the next step in the process, as the Court reads the

3    statute, is to determine the degree or extent of a sentencing

4    reduction based on the 3553(a) sentencing factors.  There is a

5    world in the statutory extremes, they're notwithstanding

6    extraordinary and compelling reasons to allow -- to reduce a

7    defendant's sentence, the defendant's sentence will not be

8    reduced because they are too dangerous to release or any other

9    of the purposes of punishment.  In other words, the question

10   that the Court reaches after evaluating and determining whether

11   there's an extraordinary and compelling reasons to reduce the

12   sentence is can that sentence be reduced consistent with the

13   3553(a) factors?  The parties here, as I indicated in my

14   questioning, suggest that Mr. Young should either be completely

15   released now or that he has to maintain -- the Court has to

16   maintain the 240-month sentence.

17        But the Court believes that it does have the authority

18   to reduce his sentence.  I've concluded that the nature and

19   circumstances underlying Mr. Young's offense preclude the Court

20   from totally releasing him at this time, but I see nothing in

21   the statute that prevents the Court from reducing the term of

22   imprisonment that it previously imposed based on the change in

23   intervening law concerning what just punishment requires under

24   these circumstances.

25        As the Court emphasized when it imposed Mr. Young's

1    original sentence -- and this is related to the nature and

2    circumstances of the offense -- Mr. Young ran a serious drug

3    distribution scheme out of his own home.  It was filled with

4    ammunition and at times large quantities of heroin and other

5    drugs.

6         There was a jury trial in this case.  The Court heard

7    the testimony, saw the evidence, and based on the evidence

8    presented at his trial, Mr. Young appeared to relish his role

9    as a "big boy," a "kingpin" heroin dealer.  These are the kinds

10   of things that he was caught on tape talking about in his

11   jailhouse tapes.  This was the kind of circumstance that was

12   presented in all of the evidence.  And as I said during his

13   sentence, he appeared to have little or no concerns to the

14   people and the community that were harmed by this conduct, not

15   to mention what appeared to the Court to be a lack of concern

16   for his own family members whom he put in harm's way with this

17   behavior.

18        This was very serious conduct.  And given the severity

19   of this criminal behavior, the Court cannot in good conscience

20   release him at this time because reducing his sentence to 41

21   months plainly diminishes the seriousness of his offense and

22   failed to promote respect for the law.

23        That said, the required review of the 3553(a) factors

24   necessitate consideration of not only the nature and

25   circumstances of the offense, but also such other factors as

1    Mr. Young's history and characteristics, the danger that

2    Mr. Young poses to the community, and the need to avoid

3    unwarranted sentencing disparities between defendants who have

4    committed similar crimes.

5        And in the end, the reduced sentence must be sufficient

6    but not greater than necessary to comply with the purposes of

7    punishment set forth in section 3553(a).  This Court's

8    reexamination of the section 3553(a) sentencing factors leads

9    inexorably to the conclusion that a sentence of 240 months of

10   imprisonment is greater than necessary to promote the purposes

11   of punishment in light of all of the sentencing factors.

12       To start, even though Mr. Young has committed a very

13   serious offense, he does not have an extensive criminal

14   history.  As we've been discussing, at the time this Court

15   imposed Mr. Young's original -- original sentence, his total

16   criminal history score was based on a misdemeanor conviction

17   for possessing marijuana in 2012.  And unlike other defendants

18   who come before this Court on a sentence reduction under this

19   statute, it appears that Mr. Young has not engaged in any

20   misconduct while incarcerated.  The BOP has apparently

21   classified Mr. Young as a low security inmate.

22       Mr. Young appears to have made positive changes in his

23   life and outlook while in prison.  There are letters that

24   indicate, both from Mr. Young and his family members, certain

25   changes in mindset.  Mr. Young has facilitated a group -- group

1   session at Rivers to help fellow inmates learn from their

2   mistakes.  Mr. Young's wife emphasized the strides her family

3   has made over the years now that they have relocated.  The

4   Court has also read letters from Mr. Young's children, and it's

5   clear that Mr. Young has a supportive family that's committed

6   to helping him steer clear of the criminal justice system.

7        Mr. Young also has medical conditions that may --

8   Ms. Perales has been discussing, pointing to.  Those are

9   factors that are taken into account with respect to his history

10  and characteristics, and, altogether, all of these things weigh

11  in favor of a term of incarceration that is less than the

12  240-month term that the Court previously imposed.  The Court is

13  also of the view that given his relatively minimal criminal

14  history, his increasingly ill health, and the progress he

15  appears to have made so far in prison, Mr. Young is certainly

16  less of a serious danger to the community than he was when the

17  Court first issued its sentencing order.

18       The need to avoid unwarranted sentencing disparities

19  also weighs in favor of a reduced term, and I will say that

20  it's that consideration that concerns me the most, as was

21  evidenced during the Court's original sentencing hearing.  I

22  understand the government's position that the sentence that I

23  imposed pursuant to the -- the 240-month mandatory minimum,

24  takes into account the government's view that Mr. Young was

25  actually more of a serious offender than otherwise would have

1    been the case, but the government cannot dispute that if

2    Mr. Young had come before the Court today for sentencing, the

3    baseline would have been totally different.  A person doing

4    exactly what Mr. Young had done with exactly his same set of

5    circumstances would not be facing 240 months in prison.  In

6    fact, he would have been -- he would have been facing the

7    guideline range of 151 to 188 months, and it was actually the

8    government's 851 notice that triggered the mandatory minimum

9    sentence under circumstances even at the time the Court found

10   to be unfair.

11        That notice was based on a felony drug conviction from

12   1994 when Mr. Young was just 22 years old.  It was so old that

13   it did not even generate criminal points under the guidelines,

14   criminal history points, but I was, nevertheless, required to

15   apply the enhancement and sentence Mr. Young to two years of

16   imprisonment.  Well, the First Step Act now says that the Court

17   is not to do any such thing and the government is not to use

18   convictions that are that old under those circumstances to

19   enhance a defendant's sentence.

20        Now, we know from the D.C. Circuit that this change in

21   the law does not automatically entitle Mr. Young to a new

22   sentence because his sentence was imposed before the act's

23   passage and Congress did not make their change retroactive.

24   But everyone agrees today that if he had been sentenced just a

25   few months later, he would not be serving a 240-month sentence

1       to date, and it's that disparity that implicates the section

2       3553(a) factors.

3               And I want to be clear.  The Court feels as though, in

4       this moment, per Mr. Young's compassionate release motion,

5       which legitimately raises concerns about his lengthy period of

6       incarceration due to his medical condition, the Court is being

7       called upon to evaluate the length of his sentence under

8       3553(a).

9               That is how I read the statute, and that is what I'm

10      called to do.  And so it is almost as if I'm sentencing him

11      today; and if I were to do so, a defendant sentenced today for

12      the exact same crime with the same exact history and

13      characteristics would face 151 to 188 months of imprisonment, a

14      sentence that is well below the 240 months that Mr. Young

15      received.  I find this disparity deeply troubling.  It casts

16      serious doubt on the fairness of Mr. Young's prior sentence,

17      and it presents the -- that type of unwarranted sentencing

18      disparity that section 3553(a) seeks to prevent.

19              And so for that reason, I will grant Mr. Young's motion.

20      I'm mindful of the seriousness of his conduct, and so as a

21      result, I'm not going to let him out nor am I going to vary

22      from what his otherwise applicable guideline range should be,

23      which I think is sufficient but not greater than necessary for

24      the conduct that he actually committed, taking into account all

25      of his history and characteristics and the other factors of

1    3553(a).

2         I'm going to grant the motion.  I'm going to reduce the

3    sentence.  As I said, the statute does not just authorize total

4    release or maintenance of the prior sentence, and so I conclude

5    that a term of 151 months is sufficient but no greater than

6    necessary to achieve the purposes of punishment.  This sentence

7    represents the bottom of the applicable guideline range and

8    adequately accounts for the seriousness of Mr. Young's offense,

9    his history and characteristics, need to protect the public,

10   and the need to avoid unwarranted sentencing disparities.

11        In addition, because the 851 notice raised Mr. Young's

12   mandatory supervised release term from 5 to 10 years, I'm

13   going to reduce the supervised release term for the offense to

14   60 months.  It will run concurrently with the 12-month term of

15   supervised release that the Court previously imposed for

16   Mr. Young's unlawful possession of a firearm.

17        I am also -- in addition to issuing the order that

18   memorializes these changes, I'm also going to issue an amended

19   judgment and commitment order which will have this changed

20   sentence and will recommend to the Bureau of Prisons that

21   Mr. Young be moved to a different facility in light of the

22   various medical conditions and the risks to him.

23        I wanted to say very clearly that COVID-19 is not only

24   present in prisons.  As you are well aware, the virus is

25   everywhere, and it has impacted not only every incarcerated

1    individual in this country, but every person in the entire

2    world.  So I -- I appreciate that Mr. Young faces risks due to

3    his medical condition.  So do people who have not committed

4    crimes.

5         The best I can do under those circumstances is to push

6    the Bureau of Prisons to take into account his medical history,

7    to put him in a facility where his needs can be cared for, to

8    make sure that he is not unfairly targeted because of some

9    concerns about people believing that he's a snitch, to get him

10   out of protective custody based on their own view, apparently,

11   that he's a low risk offender, and I will make such a

12   recommendation in the context of my amended judgment and

13   commitment order.

14        That's all I have.  You can expect at least an amended

15   judgment.  Is there anything else that we need to address

16   today?

17             MR. DRUMMEY:  Your Honor --

18             (Indiscernible simultaneous cross-talk.)

19             MS. PERALES:  -- defense.  Thank you.

20             THE COURT:  Sorry.  Ms. Perales, is there anything

21   else?

22             MS. PERALES:  Nothing from defense counsel.  Thank

23   you.

24             MR. DRUMMEY:  I apologize, Ms. Perales.

25             No.  We just request the supervised release order

1   include the same conditions that were originally included in

2   the sentence from 2018.

3           THE COURT:  Yes.  I will reduce the term only.  The

4   conditions will remain, and the term will run concurrently with

5   the term that I imposed with the other.  Does that make sense?

6           MR. DRUMMEY:  Yes, Your Honor.  Thank you.

7       Nothing further from the government.

8           THE COURT:  All right.  Thank you.

9       Mr. Young, hopefully you were able to hear everything,

10  that you continue to improve yourself in your remaining time in

11  prison.  I am going to recommend the Bureau of Prisons move

12  you.  I can't control that, but I will ask them to.  And I wish

13  you the best of luck.  Thank you.

14          THE DEFENDANT:  Thank you, Your Honor.

15          THE COURT:  Good-bye, everyone.

16          (The proceedings concluded at 3:57 p.m.)

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                     Dated this 16th day of November, 2020.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25